## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

---

AMPLER REAL ESTATE LLC,

      Plaintiff,

v.

DOWNSTREAM PARTNERS, LP,

      Defendant.

---

CASE NO. 8:17-cv-323

**COMPLAINT**

Plaintiff AMPLER REAL ESTATE LLC ("Ampler") brings this action against DOWNSTREAM PARTNERS, LP ("Downstream") and states as follows:

## NATURE OF THE CASE

1.    This matter concerns Downstream's failure to disclose information to Ampler in connection with the purchase and sale of certain real estate, as Downstream was required to do under the terms of the parties' Real Estate Contract.  Because of Downstream's misconduct, Ampler is entitled to the relief it seeks as a matter of law.

## PARTIES

2.    Ampler is a Nebraska limited liability company with its principal place of business in Omaha, Nebraska.  Ampler acquires and develops restaurant properties.  Ampler's members are limited liability companies located in Delaware and Nebraska whose members, in turn, are domiciled in Nebraska or Illinois.

3.     Downstream is a Texas limited partnership with its principal place of business in El Paso, Texas.  Upon information and belief, all of the partners of Downstream are domiciled in Texas.  Upon information and belief, Downstream holds real estate used primarily for restaurant services.

## JURISDICTION AND VENUE

4.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and there is complete diversity of citizenship between the parties.  Ampler is a citizen of either Nebraska or Illinois based on the residence of its members. Downstream is a citizen of Texas based on the residence of its members.

5.     The Court has general and specific jurisdiction over Downstream because, at all relevant times, Downstream transacted business within this District.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Downstream "resides" in this District for purposes of venue by subjecting itself to the Court's personal jurisdiction. Venue is also proper in this District based on 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## STATEMENT OF FACTS

1.     In 2016, Downstream decided to sell its interests in certain real estate, including real estate adjacent to the I-35 freeway in Waco, Texas, near Exit 338B (the "Property").

2.     The Property is located near Exit 338, which is a freeway exit ramp.

2

3.      At all relevant times, the Property has been used for a franchised restaurant business.

4.      The location of the exit ramp and resulting traffic from the exit ramp increased the value of the Property.

7.      On December 23, 2016, Ampler and Downstream entered into their Real Estate Contract, under which Ampler purchased the Property and other real estate from Downstream.

8.      A true and correct copy of the Real Estate Contract is attached hereto as Exhibit 1.

9.      The total purchase price under the Real Estate Contract is reflected therein.

10.     Ampler and Downstream allocated a certain amount of the purchase price to the Property.

11.     The parties agreed that the allocated amount reflected the fair market value of the Property based on the location of the Property, the location of the exit ramp, and the Property's continued use as a restaurant location, which depended on the location of the exit ramp.

12.     The fair market value of the Property as articulated in Paragraph 11 and as represented in the Real Estate Contract is reflected in the certificate of insurance.

13.     A true and correct copy of the certificate of insurance is attached hereto as Exhibit 2.

3

14.     Under the Real Estate Contract, Downstream made certain representations and warranties to Ampler in relation to the Property.

15.     The Real Estate Contract states that Ampler's "obligations under th[e] Contract are conditioned upon the truth and accuracy of [Downstream's] representations and warranties." Ex. 1, § 5.1.

16.     Pursuant to Section 5.1 Downstream represented and warranted to Ampler that as of December 23, 2016, "there are no actions, suits, claims, assessments, or proceedings pending or threatened that could materially adversely affect the ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform its obligations hereunder." *Id.*, § 5.1(d).

17.     Ampler relied on the representations and warranties provided by Downstream in purchasing the Property, as Ampler was entitled to do under Section 5.1.

18.     Downstream's representation and warranty in relation to the Property that as of December 23, 2016, "there are no actions, suits, claims, assessments, or proceedings pending or threatened that could materially adversely affect the ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform its obligations hereunder" was false when made.

19.     Contrary to Downstream's representation and warranty in Section 5.1, as of December 23, 2016, there was, in fact, "actions, suits, claims, assessments, or proceedings pending or threatened that could materially adversely affect the

4

ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform its obligations hereunder." *Id.*, § 5.1(d).

20.     At all relevant times and before December 23, 2016, Downstream knew that the Texas Department of Transportation ("TDOT") had approved a major construction project for the I-35 freeway.

21.     At all relevant times and before December 23, 2016, Downstream knew that as part of the TDOT project identified in Paragraph 20, TDOT will remove and permanently close Exit 338B.

22.     The closure of Exit 338B materially impairs the value of the Property.

23.     The closure of Exit 333B makes the Property less desirable as a location to operate a franchised restaurant.

24.     Because of the closure of Exit 333B, Ampler will be unable to operate the franchised location under the current franchise.

25.     Because of the closure of Exit 333B, other franchised locations near the Property have closed.

26.     Other franchised locations that have closed since the execution of the Real Estate Contract have told Ampler that they closed because of the closure of Exit 333B.

27.     Ampler purchased the Property at a value that depended on the truth and accuracy of Downstream's representation and warranty under Section 5.1.

28.     Ampler purchased the Property at a significantly higher value than what the Property is actually worth due to the closure of Exit 333B.

5

29.    Ampler did not learn of the closure of Exit 333B until after execution of the Real Estate Contract.

30.    Ampler only learned of Downstream's misrepresentations regarding the Property after the execution of the Real Estate Contract.

31.    Downstream did not disclose information relating to the closure of Exit 333B to Ampler as Downstream was required to do under the Real Estate Contract.

32.    If Downstream had disclosed to Ampler the information relating to the closure of Exit 333B that Downstream knew as of December 23, 2016, Ampler would not have purchased the Property.

33.    If Downstream had disclosed to Ampler the information relating to the closure of Exit 333B to Ampler that Downstream knew as of December 23, 2016, Ampler would not have paid the amount that Ampler did for the Property.

34.    Ampler has been damaged because of Downstream's misrepresentations and breach of the provisions of Section 5.1.

35.    Downstream has refused to compensate Ampler for the damages Downstream has caused because of its misrepresentations and breach of Section 5.1.

36.    Section 12.11 of the Real Estate Contract states that "[s]hould either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges, and expenses, including without limitation, attorneys' fees, expended or incurred in connection therewith." Ex. 1, § 12.11.

## COUNT I
### (Breach of Contract)

37.     Ampler incorporates the foregoing allegations in Paragraphs 1-36, as if fully set forth herein.

38.     The Real Estate Contract is a valid and binding contract between Ampler and Downstream.

39.     Ampler has fully performed all of its obligations under the Real Estate Contract.

40.     Pursuant to Section 5.1(d) of the Real Estate Contract, Downstream represented and warranted to Ampler that Downstream did not have any knowledge of any "actions, suits, claims, assessments, or proceedings pending or threatened that could materially adversely affect the ownership, operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform its obligations hereunder" Ex. 1, § 5.1(d).

41.     Downstream's representation and warranty under Section 5.1 was false when made.

42.     Downstream's representation and warranty under Section 5.1 was false because Downstream knew of the closure of Exit 333B.

43.     Downstream breached Section 5.1(d) of the Real Estate Contract because it failed to disclose the closure of Exit 333B.

44.     Ampler has been damaged by Downstream's breach of the Real Estate Contract.

45.     Ampler is entitled to partially rescind the Real Estate Contract as to the Property because the value of the Property was assessed as the allocated amount referenced in paragraph 10 above or, alternatively, Ampler is entitled to an award of compensatory and consequential damages in an amount to be proven at trial.

46.     Among other relief, Ampler is entitled to recover its attorneys' fees under Section 12.11 of the Real Estate Contract.

### COUNT II
### (Rescission by Nondisclosure)

47.     Ampler incorporates the foregoing allegations in Paragraphs 1-36, as if fully set forth herein.

48.     Ampler exercised reasonable and appropriate diligence in investigating the Property based on the Real Estate Contract and the representations and warranties made by Downstream.

49.     Ampler relied on Downstream to provide truthful and accurate information in response to Ampler's due diligence requests and the representations and warranties made by Downstream.

50.     Downstream did not provide truthful and accurate information in response to Ampler's due diligence requests and the representations and warranties Downstream made.

51.     The existence of the I-35 construction project and the closure of Exit 338B was a material fact that Downstream knew about during and prior to executing the Real Estate Contract.

52.     Downstream concealed and did not disclose the existence of the I-35 construction project and closure Exit 338B to Ampler, as Downstream was required to do under the Real Estate Contract.

53.     Downstream knew that the closure of Exit 333B was material to Ampler.

54.     Based on the false and misleading information provided by Downstream to Ampler in response to Ampler's due diligence requests and the Real Estate Contract, Ampler did not learn of the existence of the closure of Exit 338B and the impact of this closure on the Property.

55.     Based on Downstream's concealment and nondisclosure of the closure of Exit 333B, Ampler is entitled to partially rescind the Real Estate Contract as to the Property, among other relief.

## <u>COUNT III</u>
### (Fraud By Nondisclosure)

56.     Ampler incorporates the foregoing allegations in Paragraphs 1-36, as if fully set forth herein.

57.     In dealing with Ampler, Downstream had a duty to disclose facts regarding the Property, including the existence of the I-35 construction project and the closure of Exit 338B.

9

58.   In response to Ampler's due diligence requests, Downstream voluntarily disclosed certain information relating to the Property, but it did not disclose all of the information in its possession that it was required to disclose to Ampler.

59.   Downstream did not disclose the information it knew about the closure of Exit 333B as Downstream was required to do.

60.   By partially disclosing only some information related to the Property and withholding other information related to the Property, Downstream's representations to Ampler about the Property were misleading and untrue.

61.   Downstream falsely represented to Ampler that Downstream had no communications with the state regulators in relation to the Property.

62.   Downstream, in fact, had communications with state regulators in relation to the Property and the closure of Exit 333B.

63.   Ampler justifiably relied on Downstream's misrepresentations or concealment of material facts regarding the Property in entering into the Real Estate Contract.

64.   The closure of Exit 333B was a material fact in relation to the purchase of the Property by Ampler.

65.   Ampler is entitled to damages in an amount to be proven at trial as a result of Downstream's fraudulent nondisclosures.

66.   Ampler designates Omaha as the place for trial of this matter.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff Ampler Real Estate LLC respectfully requests that this Court enter judgment in its favor and against the Defendant Downstream Partners LP as follows:

(i)     Enter judgement against Downstream on Counts I-III hereof;

(ii)    Award partial rescission of the Real Estate Contract as to the Property;

(iii)   Award Ampler all compensatory and consequential damages arising from Downstream's breach of the Real Estate Contract;

(iv)   Award Ampler its costs and attorney's fees in connection with this action; and

(v)    Award Ampler any such other and further relief as the Court deems just and proper.

Dated 1st day of September, 2017.

Respectfully submitted,

AMPLER REAL ESTATE LLC, Plaintiff

By:  /s/Kenneth W. Hartman
     Kenneth W. Hartman (NE #21954)
of   BAIRD HOLM LLP
     1700 Farnam Street, Suite 1500
     Omaha, Nebraska  68102-2068
     Tel: 402-344-0500
     Fax: 402-344-0588
     khartman@bairdholm.com

DOCS/1940111.1

11

EXHIBIT

1

## REAL ESTATE CONTRACT

This Real Estate Contract ("*Contract*") is made and entered into as of  December 23, 2016 (the "*Effective Date*") by and between **DOWNSTREAM PARTNERS, LP**, a Texas limited partnership ("*Seller*") and **AMPLER REAL ESTATE LLC**, a Nebraska limited liability company ("*Purchaser*"), upon the terms and conditions set forth below.

### ARTICLE I
### PURCHASE AND SALE

Seller agrees to sell and convey and Purchaser agrees to purchase, in accordance with the terms, conditions and stipulations set forth in this Contract, all of Seller's right, title and interest in and to (a) the real properties as more particularly described on Exhibit A attached hereto, any and all improvements thereon and appurtenances thereto, and all other property interests belonging or appurtenant to the Real Property (individually and collectively, the "*Real Property*"); (b) all tangible personal property owned by Seller, if any, and situated upon and used in connection with the ownership, operation, use, enjoyment, development or redevelopment of the Real Property, including, without limitation, all raw materials, work and materials in process, stock in trade, inventory, heating, ventilating and air conditioning systems and equipment, plumbing systems and equipment, electrical systems and equipment, and other systems and equipment used or useful in connection with the Real Property (collectively, the "*Personal Property*"); and (c) all assignable warranties, guaranties, indemnities and claims issued to or owned by Seller, if any, in connection with the Real Property and the Personal Property (collectively, the "*Warranties*") (all of the foregoing items in clauses (a) through (c) above, now or hereafter existing, collectively, the "*Property*" or "*Properties*").   Notwithstanding any provision contained in this Contract, expressly excluded from the definition of "Property" are the following items:  personal property, appliances, furniture and equipment owned or leased by any tenant in possession of the Property pursuant to leases from time to time situated on or used in connection with the Property.

### ARTICLE II
### PURCHASE PRICE

**2.1**     **Amount of Purchase Price.**  The purchase price for the Property (the "*Purchase Price*") is ███████████████  The Purchase Price shall be adjusted at the Closing to include all third-party and documented costs and expenses incurred by Seller in accordance with Schedule 2.1 from the Effective Date hereof through the Closing Date in connection with the construction and development of the Killeen Property (as hereinafter defined).

**2.2**     **Earnest Money.**  On or before five (5) Business Days after the Effective Date of this Contract, Purchaser will deposit a check in the amount of ████████████████  The Earnest Money shall be deposited in a non-interest bearing account in a federally insured financial institution chosen by the Title Company.  If Purchaser fails to deposit the Earnest Money as required by this contract, Seller may terminate this contract and, upon such termination, Seller and Buyer shall be fully released from any obligations to each other of any nature, including, without limitation, all obligations and liabilities under this Contract. At the Closing, the

Earnest Money will be credited to the Purchase Price, unless this Contract is otherwise terminated in accordance with the terms hereof. Notwithstanding anything in this Contract to the contrary (except with respect to section 3.5 below), in the event that this Contract is terminated by Purchaser for any reason pursuant to a right of termination contained in this Contract, the Earnest Money shall be promptly returned by the Title Company to Purchaser.

## ARTICLE III
## INSPECTION

**3.1    Seller's Delivery of Specified Documents.** Seller and Purchaser acknowledge that Seller has furnished to Purchaser the following documents (collectively the "*Property Information*") for review: (i) true and correct copies of any and all leases pertaining to the Property, and any amendments thereto; (ii) copies of any and all service contracts, management agreements and/or similar contracts affecting the Property, if any; and (iii) copies of all  construction plans and specifications, architectural and engineering documents, structural and inspection reports, "as-built" plans, and other similar documents relating to the construction of the improvements on the Property in Seller's possession, and (iv) all environmental reports, asbestos studies, soil and substrata studies, and other similar reports pertaining to the Property in Seller's possession (the "*Environmental Reports*"). Purchaser may order an update to the Environmental Reports or new Phase I environmental assessment reports at its own cost and expense, if deemed necessary by Purchaser in its sole discretion. Purchaser may not undertake an invasive test of any part of the Property or any Phase II environmental investigation without the prior written approval of Seller, which approval may be withheld for any reason or no reason. The receipt of such update or new report shall not extend the Review Period or Closing Date, or be a condition to Closing.

**3.2    Review Period.** The term "*Review Period*" shall mean the period beginning on the Effective Date and ending January 20, 2017. Purchaser shall have the right to examine, inspect and investigate the Property, the Property Information and title and survey matters during the Review Period to determine, in Purchaser's sole and absolute judgment, whether the Property is suitable for Purchaser's intended use and purpose. In the event Purchaser determines in its sole discretion that the Property is not suitable for its purposes, Purchaser may terminate this Contract by delivering a timely written notice of termination to Seller within the Review Period. If Purchaser fails to terminate this Contract within the Review Period, except as otherwise set forth herein, the Earnest Money shall become non-refundable to Purchaser.

**3.3    Right of Access and Investigation.** Subject to the rights of existing tenants, and upon no less than two (2) business days advance written notice to Seller (or such shorter period of time as may be approved by Seller), Seller hereby grants to Purchaser, its agents and contractors, access to the Property for the purpose of conducting surveys, architectural, engineering, geotechnical and environmental inspections and tests (including sampling and non-destructive invasive testing for the presence of hazardous materials, feasibility studies and any other non-destructive inspections, studies or tests reasonably required by Purchaser in connection with Purchaser's due diligence). Subject to the rights of existing tenants, during the pendency of this Contract, Purchaser and its agents and contractors shall have a continuing right of access to the Property and the right to examine and make copies of the Property Information and all other materials relating to the Property in Seller's possession. In the course of its investigation, Purchaser may make inquiries to third parties including, without limitation, lenders, contractors, property managers and municipal, local and other government officials and representatives, and Seller consents to such inquiries.

**3.4    Return of Earnest Money.** If Purchaser timely notifies Seller and the Title Company of

2

its decision to terminate this Contact pursuant to the terms hereof, the Earnest Money, less the Independent Contract Consideration, shall be refunded to Purchaser promptly following such notification, and all further rights and obligations of the parties under this Contract shall terminate except for the obligations of Purchaser in Sections 3.5 and 3.6 hereof.

      **3.5**    **Indemnity.** If any inspection or test conducted by or for Purchaser disturbs the Property, Purchaser will restore the Property to substantially the same condition as existed prior to any such inspection or test. Purchaser shall keep the Property free and clear of any liens and will indemnify, defend, and hold Seller harmless from all losses, costs and damages including reasonable attorneys' fees resulting from Purchaser's inspections; provided, however, Purchaser shall have no liability with respect to any diminution in value or other losses suffered or incurred by Seller as a result of the discovery of any pre-existing conditions on, in, under or about the Property by Purchaser or its agents, employees or contractors during or in connection with such inspection and assessment. This indemnity obligation of Purchaser shall survive the termination of this Contract for any reason.

      **3.6**    **Return of Documents.** If this Contract is terminated for any reason, Purchaser shall promptly deliver to Seller all Property Information and other documents delivered to Purchaser (its agents, representatives or designees) by Seller or Seller's agents, representatives or employees pursuant to this Contract, together with a copy (at no cost to Seller) of all engineering reports, environmental studies, and other studies and reports obtained by Purchaser with respect to the Property. Purchaser shall not be liable to Seller for the accuracy or inaccuracy of any such studies or reports obtained by Purchaser or for any effect that any information contained in such studies or reports has or could have on the value of the Property.

## ARTICLE IV
## TITLE AND SURVEY REVIEW

      **4.1**    **Delivery of Title Commitments.** Seller, at Seller's sole cost and expense, shall within seven (7) days after Purchaser's deposit of the Earnest Money with the Title Company, cause to be prepared and delivered to Purchaser and its counsel: (i) a current, effective commitment for title insurance for each of the real properties (the "*Title Commitments*") for an owner's title insurance policy (the "*Title Policy*") issued by the Title Company, in the amount of the Purchase Price, with Purchaser as the proposed insured, and accompanied by true, complete and legible copies of all documents referred to in the Title Commitments; and (ii) Seller's current surveys of the Property (the "*Surveys*"), if any. Any update to or recertification of such Survey shall be at the sole cost and expense of Purchaser. If Purchaser desires a new survey of the Property, Purchaser may obtain one at its sole cost and expense. The receipt of such update or new survey shall not extend the Review Period or the Closing Date, or be a condition to Closing.

      **4.2**    **Title Review and Cure.**    Within ten (10) days after Purchaser's receipt of the Title Commitments, Purchaser shall notify Seller in writing of Purchaser's objections, if any, to any exceptions or other title matters shown on the Title Commitments. During the Review Period provided for in Section 3.2 hereof, the parties will cooperate with one another in endeavoring to cure or secure title insurance over any objections Purchaser may have to the title to the Property as disclosed by the Title Commitments and Surveys ("*Title Defects*"). Seller shall have no obligation to cure title objections other than liens of any kind against the Property, including, without limitation, (a) mortgage liens, (b) security interests, (c) tax liens, (d) abstracts of judgment, (e) environmental liens, and (f) materialmen's and mechanic's liens ("*Monetary Liens*"), which liens Seller shall cause to be released at or prior to the Closing. Seller agrees to remove any exceptions or encumbrances to title which are created by, under or through Seller after the Effective Date and which are not permitted by the terms of this Contract, and any mechanics' and materialman's liens (or, at Seller's election, bond around in accordance with applicable state law and

3

Title Company requirements) filed against the Property during the pendency of this Contract, unless the same arise by, through or under Purchaser, its affiliates, employees, agents or contractors. The term "*Permitted Exceptions*" shall mean the specific exceptions to title (other than the Monetary Liens which Seller must remove), including, without limitation, any exceptions that the Title Company has not agreed to insure over or remove from the Title Commitments during the Review Period, or thereafter, and any matters disclosed in the Survey. Notwithstanding anything to the contrary in this Contract, if Purchaser fails to terminate this Contract by giving written termination notice to Seller within the Review Period, then any Title Defects that Seller has not cured and which are shown on the Surveys or the Title Commitments (other than Monetary Liens and items which Seller has agreed in writing to cure or caused to be cured) shall be deemed to be waived and accepted by Purchaser and shall be Permitted Exceptions.

**4.3   Delivery of Title Policy at the Closing.** At the Closing, as a condition to Purchaser's obligation to close, Seller, at Seller's sole cost and expense, shall cause the Title Company to deliver to Purchaser an Owner's Policy of Title Insurance (the "*Title Policy*") issued by the Title Company, dated the date and time of the recording of the deed for the Property in the amount of the Purchase Price, insuring Purchaser as owner of good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions. Seller shall execute at the Closing an affidavit satisfactory to Purchaser and to the Title Company in order for the Title Company to delete its standard printed exception as to parties in possession, unrecorded liens and similar matters. The Title Policy must contain any endorsements that the Title Company has agreed to issue if the requirements for issuance are satisfied.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

**5.1   Seller's Representations and Warranties.** In addition to the representations and warranties contained in other sections of this Contract, Seller makes the following representations and warranties and agrees that Purchaser's obligations under this Contract are conditioned upon the truth and accuracy of such representations and warranties, both as of the Effective Date and as of the Closing Date:

**(a)   Organization and Authority.** Seller is duly organized or formed, validly existing and in good standing under the laws of its state of formation. Seller has all requisite power and authority to execute, deliver and perform its obligations under this Contract and all of the other documents and instruments delivered in accordance with this Contract, and to carry out the transaction described herein. The person who has executed this Contract on behalf of Seller has been duly authorized to do so.

**(b)   Enforceability of Documents.** Upon execution by Seller, this Contract and the other documents and instruments delivered in accordance with this Contract to which Seller is a party shall constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar laws relating to or affecting the rights of creditors generally, or by general equitable principles.

**(c)   OFAC List.** Seller is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

**(d)   Claims.** To the best of Seller's knowledge, there are no actions, suits, claims, assessments, or proceedings pending or threatened that could materially adversely affect the ownership,

4

operation, use, enjoyment, development or redevelopment of the Property or Seller's ability to perform its obligations hereunder.

**5.2    Purchaser's Representations and Warranties.**    Purchaser makes the following representations and warranties and agrees that Seller's obligations under this Contract are conditioned upon the truth and accuracy of such representations and warranties, both as of the Effective Date and as of the Closing Date:

(a)    **Organization and Authority.**  Purchaser is duly organized and formed, validly existing and in good standing under the laws of its state of formation.  Purchaser has all requisite power and authority to execute, deliver and perform its obligations under this Agreement and all of the other documents and instruments delivered in accordance with this Agreement and to carry out the transaction described herein.  The person who has executed this Agreement on behalf of Purchaser has been duly authorized to do so.

(b)    **Enforceability of Documents.**  Upon execution by Purchaser, this Agreement and the other documents and instruments delivered in accordance with this Agreement shall constitute the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar laws relating to or affecting the rights of creditors generally, or by general equitable principles.

(c)    **OFAC List.**  Purchaser is not currently identified on the OFAC List, and is not a person with whom a citizen of the United States is prohibited from engaging in transactions by any trade embargo, economic sanction, or other prohibition of United States law, regulation, or executive order of the President of the United States.

**5.3    Survival of Representations, Warranties and Covenants.**  The representations and warranties contained in Sections 5.1 and 5.2 and the provisions of this Contract that contemplate performance after the Closing shall, to the extent not actually known by the warrantee to be inaccurate as of the Closing, survive the Closing for a period of one hundred eighty (180) days and shall not be deemed to be merged into or waived by the instruments of such Closing.

**5.4    AS-IS.**    EXCEPT   FOR   SELLER'S   REPRESENTATIONS   AND WARRANTIES IN SECTION 5.1 OF THIS CONTRACT AND SELLER'S CLOSING DOCUMENTS, THIS SALE IS MADE WITHOUT REPRESENTATION, COVENANT, OR WARRANTY OF ANY KIND (WHETHER EXPRESS OR IMPLIED) BY SELLER. AS A MATERIAL PART OF THE CONSIDERATION FOR THIS AGREEMENT, BUYER AGREES TO ACCEPT THE PROPERTY ON AN "AS IS" AND "WHERE IS" BASIS, WITH ALL FAULTS, AND WITHOUT ANY REPRESENTATION OR WARRANTY, ALL OF WHICH SELLER HEREBY DISCLAIMS. EXCEPT FOR SELLER'S WARRANTIES AND SELLER'S CLOSING DOCUMENTS, NO WARRANTY OR REPRESENTATION IS MADE BY SELLER AS TO FITNESS FOR ANY PARTICULAR PURPOSE, MERCHANTABILITY,   DESIGN,   QUALITY,   CONDITION,   OPERATION   OR   INCOME, COMPLIANCE WITH DRAWINGS OR SPECIFICATIONS, ABSENCE OF DEFECTS, ABSENCE OF HAZARDOUS OR TOXIC SUBSTANCES, THE PRESENCE OF LEAD-CONTAINING DUST, ABSENCE OF FAULTS, FLOODING, OR COMPLIANCE WITH LAWS AND REGULATIONS INCLUDING, WITHOUT LIMITATION, THOSE RELATING TO HEALTH, SAFETY, AND THE ENVIRONMENT   (INCLUDING,   WITHOUT   LIMITATION,   THE   ADA).    BUYER ACKNOWLEDGES THAT BUYER HAS ENTERED INTO THIS AGREEMENT WITH THE INTENTION OF MAKING AND RELYING UPON ITS OWN INVESTIGATION OF THE

CHI 67661375v7

PHYSICAL, ENVIRONMENTAL, ECONOMIC USE, COMPLIANCE, AND LEGAL CONDITION OF THE PROPERTY.

## Article VI
## CONDITIONS PRECEDENT TO CLOSING; COVENANTS OF SELLER

**6.1**    **Purchaser's Conditions to Closing**.  The following conditions must be satisfied not later than the Closing Date or such period of time as may be specified below and, as such, are conditions precedent for Purchaser to proceed with the Closing:

(a)    Seller shall have delivered to the Title Company the items described in Section 7.2 in accordance therewith; and

(b)    As of the Closing Date, the Title Company will issue or have irrevocably committed to issue the Title Policy to Purchaser, subject to the Permitted Exceptions; and

(c)    Purchaser and Seller shall have closed the transactions described in that certain Asset Purchase Agreement of even date herewith by and between QSR Burgers, LLC, as Seller, and Ampler Burgers LLC, as Buyer.

(d)    All leases, vendor contracts, service contracts and other contracts and agreements with respect to the Property that Purchaser notifies Seller in writing that Purchaser will not assume at Closing (collectively the "*Property Agreements*") shall have been terminated at no cost to Purchaser.

(e)    All covenants and other obligations of Seller set forth in this Contract which if not fully and timely been performed would have a material adverse effect on Purchaser's rights under this Contract shall have been fully and timely performed in all material respects.

If the foregoing conditions set forth in this Section 6.1 are not satisfied or waived by Purchaser on or prior to the Closing Date, Purchaser may, at its election, terminate this Agreement by written notice delivered to Seller and to the Title Company, in which case, so long as Purchaser has not caused an Event of Default, the Earnest Money shall be returned to Purchaser and neither party shall have any further obligation or liability, except for the obligations and provisions which are expressly stated to survive termination of this Agreement.

**6.2**    **Seller's Conditions Precedent to Closing**.  The following conditions must be satisfied not later than the Closing Date or such period of time as may be specified below and, as such, are conditions precedent for Seller to proceed with the Closing:

(a)    Purchaser shall have delivered to the Title Company the items described in Section 7.3 in accordance therewith; and

(b)    Purchaser and Seller shall have closed the transactions described in that certain Asset Purchase Agreement of even date herewith by and between QSR Burgers, LLC, as Seller, and Ampler Burgers LLC, as Buyer.

If the foregoing conditions set forth in this Section 6.2 are not satisfied or waived by Seller on or prior to the Closing Date, Seller may, at its election, terminate this Agreement, in which case, so long as Purchaser has not caused an Event of Default, the Earnest Money shall be returned to Purchaser and

*CHI 67661375v7*

neither party shall have any further obligation or liability, except for the obligations and provisions which are expressly stated to survive termination of this Agreement.

**6.3    Covenants of Seller**. Seller hereby covenants with Purchaser, which covenants shall survive Closing, as follows:

(a)    subsequent to the Effective Date, Seller will not, without the prior written consent of Purchaser, enter into any employment agreement, management agreement, agreement of purchase and sale, earnest money contract, option agreement, right of first refusal, letter of intent, lease, license or other agreement affecting the Property;

(b)    provided that Purchaser has notified Seller in writing that Purchaser will not assume certain Property Agreements at least five (5) days prior to Closing, Seller will, at Seller's cost and expense, terminate all Property Agreements;

(c)    subsequent to the Effective Date and through the date of Closing, Seller will (i) maintain the Property in a good and businesslike manner and in the same manner as Seller has previously maintained the same, (ii) not commit or permit to be committed any waste to the Property, (iii) continue all insurance policies concerning the ownership, operation, use, enjoyment, development or redevelopment of the Property in full force and effect and neither cancel nor amend any of the same without Purchaser's prior written consent, and (iv) not remove any personal property from the Property unless it is simultaneously replaced with an item of at least equal value that is properly suited for its intended purpose;

(d)    Prior to Closing, Seller shall, at its sole cost and expense, comply with any and all applicable subdivision regulations and similar ordinances necessary to allow for the legal and lawful conveyance of the Property from Seller to Purchaser.

(e)    Seller shall notify Purchaser immediately after the same occurs of any material change concerning the Property, the representations and warranties contained in Section 5.1 hereof, or any other information heretofore or hereafter furnished to Purchaser concerning the Property.

(f)    Seller shall not amend or modify any of the Killeen Documents (as hereinafter defined), without Purchaser's prior written consent, and Seller shall obtain estoppels from each party to the Killeen Documents in forms acceptable to Purchaser, stating among other things that the applicable Killeen Document is in full force and effect and unmodified (except for any modifications referenced in such estoppel), that Seller is not in default thereunder, and the amount paid by Seller to such party pursuant to the applicable Killeen Document as of the date of the estoppel.

## ARTICLE VII
## CLOSING

**7.1    Date, Time and Location of the Closing.**  The closing of the transactions contemplated herein shall be held at the offices of the Title Company no earlier than January 1, 2017 and no later than February 28, 2017, which date is herein referred to as the "*Closing Date*" or the "*Closing*").

**7.2    Seller's Deliveries at Closing.**  At the Closing, Seller shall deliver the following:

7

*CHI 67661375v7*

(a)     **Deed.** A special warranty deed or deeds in a form approved by Purchaser, executed and acknowledged by Seller, conveying to Purchaser good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions;

(b)     **FIRPTA.** A Foreign Investment in Real Property Tax Act affidavit executed by Seller. If Seller fails to provide the necessary affidavit and/or documentation of exemption on the Closing Date, Purchaser may proceed with all withholding provisions as provided by law;

(c)     **Assignment of Leases.** An assignment and assumption of the leases affecting the Property in a form approved by Seller and Purchaser, executed by Seller and Purchaser, except to the extent that Purchaser has notified Seller that such Leases will not be assumed;

(d)     **Bill of Sale and Assignment.** A bill of sale and assignment of the Personal Property and Warranties in a form approved by Purchaser, executed by Seller.

(e)     **General Assignment.** An assignment and assumption of all service contracts affecting the Property (other than any such contracts that Purchaser notifies Seller to terminate prior to Closing) and the Killeen Documents, in a form approved by Purchaser and executed by Seller.

(f)     **Authority.** Evidence of existence, organization and authority of Seller and the authority of the person executing documents on behalf of Seller reasonably satisfactory to Purchaser and the Title Company;

(g)     **State Law Disclosures.** Any disclosures and reports required by applicable State law in connection with the conveyance of the Property;

(h)     **Seller's Affidavit.** A seller's affidavit, ALTA Statement and/or similar certification as may be required by the Title Company to issue the Title Policy;

(i)     **Additional Documents.** Any additional documents that Purchaser or the Title Company may reasonably require for the proper consummation of the transaction.

7.3     **Purchaser's Deliveries at Closing.** At the Closing, Purchaser shall deliver the following:

(a)     **Purchase Price.** The Purchase Price for the Property (after crediting any Earnest Money to be applied against it), plus or minus the applicable prorations, which shall be deposited by Purchaser with the Title Company in immediate, same day federal funds (all or any part of which may be the proceeds of a loan) wired for credit into such account as the Title Company may designate.

(b)     **Assignment of Leases.** An assignment and assumption of the leases affecting the Property, in a form approved by Seller and Purchaser, executed by Seller and Purchaser, except to the extent that Purchaser has notified Seller that such Leases will not be assumed.

(c)     **Bill of Sale and Assignment.** A bill of sale and assignment of the Personal Property and Warranties.

(d)     **General Assignment.** An assignment and assumption of all service contracts affecting the Property (other than any such contracts that Purchaser notifies Seller to terminate prior to Closing) and the Killeen Documents.

*CHI 67661375v7*

(e)     **Capacity and/or Authority.**  Evidence of capacity and/or authority of Purchaser and the authority of the person executing documents on behalf of Purchaser reasonably satisfactory to Seller and the Title Company.

(f)     **State Law Disclosures.**  Any disclosures and reports required by applicable state law in connection with the conveyance of the subject Property.

(g)     **Additional Documents.**  Any additional documents that Seller or the Title Company may reasonably require for the proper consummation of the subject transaction.

7.4     **Closing Statements/Escrow Fees.**  At the Closing, Seller and Purchaser shall execute closing statements consistent with this Contract in the form required by the Title Company.  The Title Company's escrow fee shall be divided equally between and paid by Seller and Purchaser.

7.5     **Possession.**  At the Closing Seller shall deliver to Purchaser possession of the Property subject only to the Permitted Exceptions.

## ARTICLE VIII
## CLOSING COSTS; PRORATIONS; OTHER ALLOCATIONS

8.1     **Closing Costs.**  Costs for the Title Policy for the Property, the special warranty deed from Seller to Purchaser conveying the Property, tax certificates and one-half of the escrow fee charged by the Title Company shall be the Seller's expense.  One-half of the escrow fee, and the cost of any survey deletion in the Title Policy, if any, shall be allocated to Buyer.  All other costs and expenses incurred in this transaction that are not specifically allocated to Seller or Buyer shall be allocated between the parties in the manner customary for transactions of this type in the county in which the property is located. The provisions of this Section 8.1 shall survive the Closing.

8.2     **Prorations.**     The following shall be apportioned or prorated between Seller and Purchaser as of the close of the day preceding the Closing Date:

(a)     **Rents.**   Rents actually paid to and received by Seller with respect to the respective Properties for the month in which Closing occurs shall be prorated as of the Closing Date.  Any security deposit held by Seller with respect to the Property shall be credited to Purchaser at Closing.  All prorations of rents shall be made on the basis of actual days of the month of which the Closing Date occurs and actual days elapsed.  All prorations shall be final.

(b)     **Taxes and Assessments.**   General real estate taxes and assessments imposed by any governmental authority and any assessments by private covenant constituting a lien or charge on the Property for the then-current calendar year or other current tax period not yet due and payable shall be prorated. If the Closing occurs prior to the receipt by Seller of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, taxes for such calendar year or other applicable tax period shall be prorated based upon the most recent ascertainable assessed values and tax rates, but not less than the tax bill for the previous calendar year or other applicable tax period, and Seller and Purchaser will make all necessary adjustments by appropriate payments between themselves following Closing.  All prorations shall be based upon a fraction determined by dividing the number of days elapsed through 1 day prior to the date of the Closing by 365.  This Contract to reconcile taxes shall survive the Closing for a period of 1 year.

9

(c)     **Other Expenses.**  Other expenses related to the ownership or operation of the Property.

## ARTICLE IX
## LOSS OR CONDEMNATION

**9.1     Loss or Condemnation.**  In the event of any (i) casualty or (ii) threatened, contemplated, commenced or consummated proceedings in eminent domain (notice of which shall be given to Purchaser by Seller immediately) (a "*Loss*") affecting any material portion of the Property, Purchaser may, at its option, by notice to Seller given within ten (10) days after Purchaser is notified of such Loss (and the Closing shall be extended, if necessary, to give Purchaser such ten (10) day period to respond to such notice) (a) terminate this Contract or (b) proceed under this Contract, in which event Seller shall at the Closing, assign to Purchaser its entire right, title and interest in and to any insurance proceeds and/or condemnation award, as applicable.  Purchaser shall have the right during the pendency of this Contract to assist in negotiations and otherwise deal with the insurer or condemning authority in respect of such matter.  The amount of any deductible or deductibles under any insurance policy or policies insuring against such damage or destruction shall be credited to the Purchase Price.

**9.2     Termination.**  In the event Purchaser shall terminate this Contract pursuant to Section 9.1 above, then upon any such termination, the Earnest Money shall be promptly returned to Purchaser and neither party shall have any further rights or obligations hereunder except pursuant to any provision which by its terms survives any termination of this Contract.

## ARTICLE X
## REMEDIES

**10.1     Purchaser Default.**  If all of the conditions to Purchaser's obligation to purchase the Property have been satisfied or waived in writing by Purchaser and if Purchaser should fail to consummate the transaction for any reason other than Seller's default, failure of a condition to Purchaser's obligation to close or the exercise by Purchaser of an express right of termination granted herein, Seller's sole remedy in such event shall be to terminate this Contract and to receive the Earnest Money as liquidated damages, Seller waiving all other rights or remedies in the event of such default by Purchaser.  The parties acknowledge that Seller's actual damages in the event of a default by Purchaser under this Contract will be difficult to ascertain, and that such liquidated damages represent the parties' best estimate of such damages.

**10.2     Seller Default.**  If Seller should fail to consummate the transaction for any reason other than Purchaser's default, or failure of a condition to Seller's obligation to close, then Purchaser may, as its sole and exclusive remedy, except as set forth below: (a) terminate this Contract by giving written notice thereof to Seller, in which event the Earnest Money will promptly be returned to Purchaser; (b) waive such default and consummate the transactions contemplated hereby in accordance with the terms of this Contract; or (c) specifically enforce this Contract.

## ARTICLE XI
## REAL ESTATE COMMISSIONS

In the event that any real estate brokerage fees or commissions are to be paid in connection with

the sale of the Property, Seller agrees to pay such fees or commissions. It is agreed that if any claims for real estate brokerage fees or commissions are ever made against Seller or Purchaser in connection with this transaction, all such claims will be handled and paid by the party whose actions or alleged commitments form the basis of such claim, and the party whose actions or alleged commitments form the basis of such claim will indemnify and hold harmless the other from and against any and all such claims or demands with respect to any brokerage fees or agents' commissions or other compensation asserted by any person, firm or corporation in connection with this transaction.

## ARTICLE XII
## MISCELLANEOUS

**12.1   Assignment.** Purchaser may not assign this Contract in whole or in part without the prior consent of Seller; provided, however, Purchaser may assign or transfer its rights and obligations under this Contract at any time to any wholly owned, related, controlled or affiliated entity or party without the consent of Seller.

**12.2   Parties Bound.** This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their legal representatives, successors and permitted assigns; provided, however, that no assignment shall be made by Purchaser except in accordance with the provisions hereof.

**12.3   Governing Law.** This Contract shall, in all respects, be governed, construed, applied and enforced in accordance with the laws of the State of Texas.

**12.4   Survival.** The provisions of this Contract that specifically provide for performance after the Closing shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of the Closing.

**12.5   No Third Party Beneficiary.** This Contract is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity as a third party beneficiary, decree or otherwise.

**12.6   Entirety and Amendments.** This Contract embodies the entire Contract between the parties and supersedes all prior Contracts and understandings relating to the Property and the other matters related thereto. This Contract may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

**12.7   Execution in Counterparts.** This Contract may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Contract. To facilitate execution of this Contract, the parties may execute and exchange by any means counterparts of the signature pages. Delivery of executed counterparts of this Contract by facsimile or electronic transmission (e-mail) shall be equally effective as delivery of an executed, original counterpart of this Contract.

**12.8   Further Assurances.** In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by Seller to Purchaser at the Closing, Seller agrees to perform, execute and/or deliver or cause to be delivered, executed and/or delivered, but without any obligation to incur any additional liability or expense, on or after such Closing any and all further acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby and/or to further perfect and deliver to Purchaser the conveyance, transfer and assignment of the Property and all rights related thereto.

*CHI 67661375v7*

**12.9** __Time.__  Time is of the essence in the performance of each and every term, condition and covenant contained in this Contract.

**12.10** __U.S. Currency Required.__  All sums referred to herein shall be in currency of the United States of America.

**12.11** __Attorneys' Fees.__  Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges and expenses, including, without limitation, attorneys' fees, expended or incurred in connection therewith.

**12.12** __Use of Pronouns.__  The use of the neuter singular pronoun to refer to Seller and Purchaser shall be deemed a proper reference, even though Seller or Purchaser may be an individual, partnership or a group of two or more persons or entities.  The necessary grammatical changes required to make the provisions of this Contract apply in the plural sense where there is more than one seller or purchaser and to either entities or individuals (male or female) shall in all instances be assumed as though in each case fully expressed.

**12.13** __Notices.__  All notices, demands and requests which may be given or which are required to be given by either party to the other, and any exercise of a right of termination provided by this Contract, shall be in writing and shall be deemed effective when either: (i) personally delivered to the intended recipient; (ii) sent by certified or registered mail, return receipt requested, addressed to the intended recipient at the address set forth below; (iii) delivered in person to the address set forth below; (iv) deposited into the custody of a nationally recognized overnight delivery service such as Federal Express, addressed to such party at the address set forth below; or (v) sent by e-mail or facsimile. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.  For purposes hereof, the addresses of the parties for all notices are as set forth below (unless changed by similar notice in writing given by the particular person whose address is to be changed):

If to Seller:

With a copy to:

If to Purchaser:



12



With a copy to:

**12.14   Construction.** The parties acknowledge that the parties and their counsel have reviewed and revised this Contract and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Contract or any exhibits or amendments hereto.

**12.15   Calculation of Time Periods.** Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designed period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, nor legal holiday. The last day of any period of time described herein shall be deemed to end at 5:00 p.m. in the city where the Property is located.

**12.16   Business Day.** The term (*"Business Day"*), as used in this Contract shall mean a day, other than a Saturday, Sunday or legal holiday for commercial banks under the laws of the state where the Property is located.

**12.17   Tax Deferred Exchange**. The parties acknowledge that either Purchaser or Seller may desire that this transaction constitute a tax deferred exchange under the meaning of Section 1031 of the Internal Revenue Code. Provided there is no cost, expense or liability imposed upon the non-requesting party, and the non-requesting party is not required to take title to any other property then each party agrees to execute any and all additional documentation that may be reasonably necessary to assist the requesting party in concluding this transaction as part of a tax deferred exchange. Neither party makes any representation or warranty whatsoever regarding whether or not this transaction will qualify as a part of a tax deferred exchange. In no event shall any such tax deferred exchange result in any delay in the closing.

**12.18   Killeen Property Development.** Seller and Purchaser hereby acknowledge that, as of the Effective Date, Seller is in the process of constructing improvements on the Real Property situated at 2902 Clear Creek Road in Killeen, Texas (the *"Killeen Property"*), and that Seller has entered into several instruments related to the development of the Killeen Property and the design and construction of improvements thereon (collectively, the *"Killeen Documents"*). At Closing, Seller shall assign all of its interests under the Killeen Documents to Purchaser, and Seller shall obtain all consents required under the Killeen Documents to effectuate such assignment.

13

**IN WITNESS WHEREOF,** the parties hereto have caused this Contract to be executed and delivered as of the Effective Date.

**SELLER:**

**DOWNSTREAM PARTNERS, LP,**
a Texas limited partnership



**PURCHASER:**

**AMPLER REAL ESTATE LLC,**
a Nebraska limited liability company



*[Signature Page to Real Estate Contract]*

**IN WITNESS WHEREOF,** the parties hereto have caused this Contract to be executed and delivered as of the Effective Date.

<u>**SELLER:**</u>

**DOWNSTREAM PARTNERS, LP,**
a Texas limited partnership



<u>**PURCHASER:**</u>

**AMPLER REAL ESTATE LLC,**
a Nebraska limited liability company



*[Signature Page to Real Estate Contract]*

**Exhibit "A"**
**Property Description**

Street Address: 10115 Rushing, El Paso, Texas

See legal description attached as Exhibit "A-1"

Street Address: 1500 South IH-35, Waco Texas

See legal description attached as Exhibit "A-2"

Street Address: 9810 Mines Road, Laredo, Texas

See legal description attached as Exhibit "A-3"

Street Address: 7515 McPherson, Laredo, Texas

See legal description attached as Exhibit "A-4"

Street Address: 1419 Guadalupe, Laredo, Texas

See legal description attached as Exhibit "A-5"

Street Address: 14290 Horizon Blvd., Horizon City, Texas

See legal description attached as Exhibit "A-6"

Street Address: 2902 Clear Creek Road, Killeen, Texas

See legal description attached as Exhibit "A-7"

15

Exhibit "A-1"

(see attached)

# 4318
Rushing



## EXHIBIT "A"

### Legal Description

Being a portion of Tract 4P, Section 29, Block 81, Township 1, Texas & Pacific Railroad Surveys, City of El Paso, El Paso County, Texas and being more fully described by metes and bounds as follows:

COMMENCING for reference at a found 1/2-inch rebar at the centerline intersection of Kodiak Avenue (60.00 feet wide) and Rushing Boulevard (80.00 feet wide);

THENCE, South 57°27'29" West, a distance of 40.00 feet to a point in the west right-of-way line of said Rushing Boulevard;

THENCE, along said west right-of-way line, South 32°32'31" East, a distance of 3.50 feet to a set 1/2-inch rebar with cap and POINT OF BEGINNING for the herein described tract;

THENCE, leaving said west right-of-way line, South 57°27'29" West, a distance of 131.85 feet to a set 1/2-inch rebar with cap;

THENCE, South 88°49'00" West, a distance of 166.04 feet to a set 1/2-inch rebar with cap;

THENCE, North 32°32'31" West, a distance of 57.49 feet to a set nail in a rockwall on the south line of Block 33, Colonia Verde Addition;

THENCE, along said south line of Block 33, the following two courses:

   North 81°01'45" East, a distance of 26.00 feet to a set "X" in a rockwall;

   North 57°27'29" East, a distance of 249.81 feet to the west right-of-way line of Rushing Boulevard and a set "X" in sidewalk;

THENCE, along said west right-of-way line, South 32°32'31" East, a distance of 133.50 feet to the POINT OF BEGINNING and containing 0.701 acre of land.

# EXHIBIT "A"

Rushing

Exhibit "A-2"

(see attached)

7/44
Baylor

## EXHIBIT "A"

Being Lot Eighteen (18) in Block Eleven (11) of the Prather's
Anita Park Addition, to the City of Waco, McLennan County,
Texas, as per plat recorded in Volume 1718, Page 239, of the
McLennan County Deed Records, (Being a resub. of Lots 1-4,
11-14, Block 11 of the Prather's Anita Park Addition (179-8)
and part of South 15th Street (Abandoned) and a 20' alley
(abandoned) to the City of Waco, McLennan County, Texas and
being further described by metes and bounds as follows:
Fieldnotes for 0.777 acre (33.873 square feet) of land being
all of Lot 1, Block 11 and part of Lots 2, 13, and 14 Block 11
of the Prather's Anita Park Addition to the City of Waco, Deed
Records of McLennan County, Texas, being also part of south
15th Street and a 20 foot alley abandoned by Ordinance
#1984-29, being also part of that certain 1.30 acre tract of
land described in a substitute trustee's deed by Allen Pruitt,
Substitute Trustee, to the Texas National Bank of Waco,
McLennan County Texas, as recorded August 4, 1989 in Volume
1669, Page 89 of said Deed Records, being described by metes
and bounds as follows:

10

11

BEGINNING at an iron stake being the intersection of the center
line of said abandoned south 15th street and the Northwesterly
line of Speight Avenue;

THENCE S 42 degrees 38 minutes 50 seconds W with said
Northwesterly Line a distance of 33.62 feet to an iron being
the southeast corner of said Lot 1;

THENCE S 42 degrees 28 minutes 31 seconds W with said
Northwesterly Line a distance of 90.38 feet to an iron stake
for a corner;

THENCE N 47 degrees 17 minutes 17 seconds W a distance of
251.52 feet to an iron stake for a corner in the east line of
Interstate highway No. 35 being also in the West line of said
Lot 13;

THENCE N 11 degrees 18 minutes E with said East and West lines
a distance of 45.36 feet to a concrete monument for a corner;

THENCE N 42 degrees 24 minutes 57 seconds E with said East line
a distance of 49.99 feet to a concrete monument for a corner;

THENCE N 22 degrees 56 minutes 5 seconds E with said East line
a distance of 37.51 feet to an iron stake for a corner being
the said center line of South 15th Street;

THENCE South 47 degrees 17 minutes 17 seconds E with said
center line a distance of 287.71 feet to the place of beginning
containing 0.777 acre (33,873 square feet) of land more or less.

Exhibit "A-3"

(see attached)

# 8319
Mines Rd.

## Exhibit "A"

Tract 1:        Lot Two "A" (2A), Block Two (2), HRC SUBDIVISION, UNIT 1, situated in Webb County, Texas, according to plat thereof recorded in Volume 13, Page 53, Plat Records of Webb County, Texas; and

Tract II:        An undivided fifty percent (50%) interest in and to Lot Two "C" (2C), Block Two (2), HRC SUBDIVISION, UNIT 1, situated in Webb County, Texas, according to plat thereof recorded in Volume 13, Page 53, Plat Records of Webb County, Texas;

Exhibit "A-4"

(see attached)

EXHIBIT "A"

# 11414
McPherson

STATE OF TEXAS
COUNTY OF WEBB

A TRACT OF LAND CONTAINING 0.8658 ACRES (37,714 S.F.) of land, situated out of the northern part of Lot 4, Block 2, Del Mar Junction, as per plat recorded April 15, 1996, Vol. 16, Page 12, Plat Records of Webb County, Texas; said 0.8658 acre tract, more or less, being more particularly described by metes and bounds as follows:

BEGINNING at a found iron rod being the intersection point between east right-of-way line of McPherson Road and the south right-of-way line of Junction Drive, for the northwest corner hereof;

THENCE N39°00'05"E - 21.41' to a found iron rod, a deflection right;.

THENCE N83°28'42"E - 34.04' to a found iron rod being the point of curvature of a 217.97' radius curve left, delta of 23°25'17", tangent of 45.18';

THENCE 89.10' along the arc of said 217.97' radius curve to the left to a found iron rod for the point of tangency;

THENCE N60°03'24"E - 100.00' to a found iron rod for the most northerly corner hereof;

THENCE S29°56'36"E - 25.00' to a found iron rod for an exterior corner hereof;

THENCE S01°35'47"E - 181.00' to a set iron rod being the most easterly corner hereof;

THENCE S83°55'49"W-229.72' to a set iron rod along the east right-of-way line of McPherson Road, for the most southerly corner hereof, said rod being a point on a 1772.68' radius curve left, delta of 04°10'10", tangent of 64.53', a chord of N03°08'38"W-128.97';

THENCE 129.00' along the arc of said 1772.68' radius curve to the left, to the PLACE OF BEGINNING of this 0.8658 acre tract of land.

Note: Basis of bearings taken from Del Mar Junction Plat recorded in Vol. 16, Page 12, Webb County, Texas Plat Records.

STATE OF TEXAS
COUNTY OF WEBB

I, John E. Foster, a Registered Professional Land Surveyor, do hereby certify that the foregoing fieldnotes are true and correct to my best knowledge and belief and was prepared from an actual survey made on the ground on September 2, 1997 under my direction and from office records available.

WITNESS MY HAND AND SEAL THIS 3RD DAY OF SEPTEMBER, 1997.

JOHN E. FOSTER, R.P.L.S. #1136 E. FOSTER
P.E. #1587   1136

97JOB50

Exhibit "A-5"

(see attached)

*Guadalupe #12275*

**EXHIBIT "A-1"**

**FIELD NOTES**
**FOR**
**1.026 ACRE**

A 1.026 acre tract of land, being all of Lot 3, Lot 4, Lot 5, Lot 6, Lot 7, Lot 8 and Lot 9, Block 791 in the Eastern Division of the City of Laredo, Volume 22 Page 638, Deed Records of Webb County, Texas and a portion of the 17.7' Alley abutting said lots as closed in Ordinance No. 2012-O-075 by the city of Laredo and being more particularly described by metes and bounds as follows:

BEGINNING a set "X" in concrete in the west right-of-way line of N Seymour Avenue at the intersection with the north right-of-way line of Chihuahua Street and for the southeast corner of Lot 7, Block 791 and tract described herein;

THENCE:  N 89° 24' 39" W along and with the north right-of-way line of Chihuahua Street and the south line of Lots 7 - 9, Block 791, a distance of 138.00 feet to a found ½" iron rod for the southeast corner of Lot 10, Block 791 and the southwest corner of Lot 9, Block 791 and the tract described herein;

THENCE:  N 00° 35' 21" E with the common line between Lots 9 and 10 and into the closed Alley, at a distance of 130.00 feet passing a set PK Nail with washer stamped "KFW Surveying" for the northeast corner of Lot 10 and the northwest corner of Lot 9 and continuing for a total distance of 138.85 feet to a point in the middle of said Alley, for an interior corner of the tract described herein;

THENCE:  N 89° 24' 39" W along and with the middle of the closed Alley, a distance of 46.00 feet to a found ½" iron rod for a west corner of the tract described herein;

THENCE:  N 00° 35' 21" E into the closed Alley and with the common line between Lots 2 and 3, a distance of 138.85 feet to a set "X" in concrete in the south right-of-way line of Guadalupe Street and for the northeast corner of Lot 2 and the northwest corner of Lot 3 and the tract described herein; .

THENCE:  S 89° 24' 39" E along and with the south right-of-way line of Guadalupe Street and the north line of Lots 3 - 6, Block 791, a distance of 184.00 feet to a set "X" in concrete in the west right-of-way line of N Seymour Avenue at the intersection with the south right-of-way line of Guadalupe Street and for the northeast corner of Lot 6, Block 791 and tract described herein; .

THENCE:  S 00° 35' 21" W along and with the west right-of-way line of N Seymour Avenue and east line of Lots 6 and 7, Block 791 at a distance of 130.00 feet passing a set "X" in concrete for the southeast corner of Lot 6 and the northeast corner of the closed Alley, at a distance of 147.70 feet passing a set "X" in concrete for the southeast corner of the closed Alley and the northeast corner of Lot 7 and continuing for a total distance of 277.70 feet to the POINT OF BEGINNING and containing 1.026 acres or 44,710 square feet more or less, in the City of Laredo, Webb County, Texas and being described in accordance with a survey prepared by KFW Surveying.

Job No.:      12-005
Prepared by:  KFW Surveying
Date:         June 18, 2012
File:         S:\Draw 2012\12-005 Burger King Laredo\Docs

974218 v1

Exhibit "A-6"

(see attached)

Horizon City
#16216

Exhibit "A"

East 109.35 feet of Lot 1, Block 1, HORIZON MANOR UNIT FIVE, an addition to El Paso County, Texas, according to the plat thereof on file in Volume 39, Page 9, Real Property Records, El Paso County, Texas.

Exhibit "A-7"

(see attached)

*# 23481*

*Killeen*

## EXHIBIT "A"

Legal description of the land:
Lot One (1), in Block One (1), of Desert Willow Commercial Subdivision Amending plat of Lot 1 and Lot 2, Block 1, in the City of Killeen, Bell County, Texas, according to the plat of record in Plat Year 2016, Number 103, Plat Records of Bell County, Texas.

Schedule 2.1

(see attached)

**EQUIPMENT DEPOSITS/CONTRACTOR DRAWS REQUIRED TO BE PAID PRIOR TO TRANSACTION CLOSING**
**BK#23481 CLEAR CREEK**
**KILLEEN, TEXAS**

**FURNITURE, FIXTURES AND EQUIPMENT**

| H &K Equipment | Kitchen Equipment-W/i and Hood: | Approximately | $ █ |
| Entera Signs | OCU, Clearance and Building Signs | Approximately | $ █ |
| Entera Signs | Pylon and Reader board | Approximately | $ █ |
| LSI Graphic Solution | Pre-menu and Menu boards for Double drive thr | Approximately | $ █ |
| Charter House | Furniture and Trim Package | Approximately | $ █ |

**CONSTRUCTION DRAW TO ARROW BUILDING CORP.**

| | | |
| Pay application for December work in progress  (due Jan 10) | | Unknowr |
| Pay application for January work in progress (due Feb 10) | | Unknowr |

**EXHIBIT**

2

Form T-1: Owner's Policy of Title Insurance (Rev. 1/3/14)

If you want information about coverage or need assistance to resolve complaints, please call our toll free number: 1-800-729-1902. If you make a claim under your policy, you must furnish written notice in accordance with Section 3 of the Conditions. Visit our World Wide Web site at: http://www.stewart.com.

## OWNER'S POLICY OF TITLE INSURANCE
### ISSUED BY

## STEWART TITLE GUARANTY COMPANY

**Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company at the address shown in Section 18 of the Conditions.**

### COVERED RISKS

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS FROM COVERAGE CONTAINED IN SCHEDULE B AND THE CONDITIONS, STEWART TITLE GUARANTY, a Texas corporation (the "Company") insures, as of Date of Policy and, to the extent stated in Covered Risks 9 and 10, after Date of Policy, against loss or damage, not exceeding the Amount of Insurance, sustained or incurred by the Insured by reason of:

1. Title being vested other than as stated in Schedule A.
2. Any defect in or lien or encumbrance on the Title. This Covered Risk includes but is not limited to insurance against loss from:
   (a) A defect in the Title caused by:
      (i) forgery, fraud, undue influence, duress, incompetency, incapacity, or impersonation;
      (ii) failure of any person or Entity to have authorized a transfer or conveyance;
      (iii) a document affecting Title not properly created, executed, witnessed, sealed, acknowledged, notarized or delivered;
      (iv) failure to perform those acts necessary to create a document by electronic means authorized by law;
      (v) a document executed under a falsified, expired or otherwise invalid power of attorney;
      (vi) a document not properly filed, recorded or indexed in the Public Records including failure to perform those acts by electronic means authorized by law; or
      (vii) a defective judicial or administrative proceeding.
   (b) The lien of real estate taxes or assessments imposed on the Title by a governmental authority due or payable, but unpaid.
   (c) Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land. The term "encroachment" includes encroachments of existing improvements located on the Land onto adjoining land, and encroachments onto the Land of existing improvements located on adjoining land.
   (d) Any statutory or constitutional mechanic's, contractor's, or materialman's lien for labor or materials having its inception on or before Date of Policy.
3. Lack of good and indefeasible Title.
4. No right of access to and from the Land.
**Covered Risks continued on next page.**

IN WITNESS WHEREOF, Stewart Title Guaranty Company has caused this policy to be signed and sealed by its duly authorized officers as of Date of Policy shown in Schedule A.

Countersigned by:

_____
Authorized Countersignature

**stewart**
title guaranty company

_____
**Matt Morris**
**President and CEO**

Stewart Title Company
415 North Mesa Street
El Paso, TX 79901
Agent ID: 43600A

_____
**Denise Carraux**
**Secretary**

File No.: 01004-16002

Page 1 of
Policy
Serial No.

**O-5966-000012505**

**COVERED RISKS CONTINUED FROM PAGE 1**

5. The violation or enforcement of any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
   (a) the occupancy, use or enjoyment of the Land;
   (b) the character, dimensions or location of any improvement erected on the Land;
   (c) the subdivision of land; or
   (d) environmental protection
   if a notice, describing any part of the Land, is recorded in the Public Records setting forth the violation or intention to enforce, but only to the extent of the violation or enforcement referred to in that notice.

6. An enforcement action based on the exercise of a governmental police power not covered by Covered Risk 5 if a notice of the enforcement action, describing any part of the Land, is recorded in the Public Records, but only to the extent of the enforcement referred to in that notice.

7. The exercise of the rights of eminent domain if a notice of the exercise, describing any part of the Land, is recorded in the Public Records.

8. Any taking by a governmental body that has occurred and is binding on the rights of a purchaser for value without Knowledge.

9. Title being vested other than as stated in Schedule A or being defective:
   (a) as a result of the avoidance in whole or in part, or from a court order providing an alternative remedy, of a transfer of all or any part of the title to or any interest in the Land occurring prior to the transaction vesting Title as shown in Schedule A because that prior transfer constituted a fraudulent or preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws; or
   (b) because the instrument of transfer vesting Title as shown in Schedule A constitutes a preferential transfer under federal bankruptcy, state insolvency or similar creditors' rights laws by reason of the failure of its recording in the Public Records:
      (i) to be timely, or
      (ii) to impart notice of its existence to a purchaser for value or a judgment or lien creditor.

10. Any defect in or lien or encumbrance on the Title or other matter included in Covered Risks 1 through 9 that has been created or attached or has been filed or recorded in the Public Records subsequent to Date of Policy and prior to the recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The Company will also pay the costs, attorneys' fees and expenses incurred in defense of any matter insured against by this Policy, but only to the extent provided in the Conditions.

**EXCLUSIONS FROM COVERAGE**

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting or relating to:
      (i) the occupancy, use, or enjoyment of the Land;
      (ii) the character, dimensions or location of any improvement erected on the Land;
      (iii) subdivision of land; or
      (iv) environmental protection;
      or the effect of any violation of these laws, ordinances or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is:
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

6. The refusal of any person to purchase, lease or lend money on the estate or interest covered hereby in the land described in Schedule A because of Unmarketable Title.

## CONDITIONS

1. **DEFINITION OF TERMS.**
   The following terms when used in this policy mean:
   (a) "Amount of Insurance": the amount stated in Schedule A, as may be increased or decreased by endorsement to this policy, increased by Section 8(b), or decreased by Sections 10 and 11 of these Conditions.
   (b) "Date of Policy": The date designated as "Date of Policy" in Schedule A.
   (c) "Entity": A corporation, partnership, trust, limited liability company or other similar legal entity.
   (d) "Insured": The Insured named in Schedule A.
      (i) the term "Insured" also includes:
        (A) successors to the Title of the Insured by operation of law as distinguished from purchase, including heirs, devisees, survivors, personal representatives or next of kin;
        (B) successors to an Insured by dissolution, merger, consolidation, distribution or reorganization;
        (C) successors to an Insured by its conversion to another kind of Entity;
        (D) a grantee of an Insured under a deed delivered without payment of actual valuable consideration conveying the Title;
          (1) If the stock, shares, memberships, or other equity interests of the grantee are wholly-owned by the named Insured,
          (2) If the grantee wholly owns the named Insured,
          (3) If the grantee is wholly-owned by an affiliated Entity of the named Insured, provided the affiliated Entity and the named Insured are both wholly-owned by the same person or Entity, or
          (4) If the grantee is a trustee or beneficiary of a trust created by a written instrument established by the Insured named in Schedule A for estate planning purposes.
      (ii) With regard to (A), (B), (C) and (D) reserving, however, all rights and defenses as to any successor that the Company would have had against any predecessor Insured.
   (e) "Insured Claimant": an Insured claiming loss or damage.
   (f) "Knowledge" or "Known": actual knowledge, not constructive knowledge or notice that may be imputed to an Insured by reason of the Public Records or any other records that impart constructive notice of matters affecting the Title.
   (g) "Land": the land described in Schedule A, and affixed improvements that by law constitute real property. The term "Land" does not include any property beyond the lines of the area described in Schedule A, nor any right, title, interest, estate or easement in abutting streets, roads, avenues, alleys, lanes, ways or waterways, but this does not modify or limit the extent that a right of access to and from the Land is insured by this policy.
   (h) "Mortgage": mortgage, deed of trust, trust deed, or other security instrument, including one evidenced by electronic means authorized by law.
   (i) "Public Records": records established under state statutes at Date of Policy for the purpose of imparting constructive notice of matters relating to real property to purchasers for value and without Knowledge. With respect to Covered Risk 5(d), "Public Records" shall also include environmental protection liens filed in the records of the clerk of the United States District Court for the district where the Land is located.
   (j) "Title": the estate or interest described in Schedule A.
   (k) "Unmarketable Title": Title affected by an alleged or apparent matter that would permit a prospective purchaser or lessee of the Title or lender on the Title to be released from the obligation to purchase, lease or lend if there is a contractual condition requiring the delivery of marketable title.

2. **CONTINUATION OF INSURANCE.**
   The coverage of this policy shall continue in force as of Date of Policy in favor of an Insured, but only so long as the Insured retains an estate or interest in the Land, or holds an obligation

secured by a purchase money Mortgage given by a purchaser from the Insured, or only so long as the Insured shall have liability by reason of warranties in any transfer or conveyance of the Title. This policy shall not continue in force in favor of any purchaser from the Insured of either (i) an estate or interest in the Land, or (ii) an obligation secured by a purchase money Mortgage given to the Insured.

3. **NOTICE OF CLAIM TO BE GIVEN BY INSURED CLAIMANT.**
   The Insured shall notify the Company promptly in writing (i) in case of any litigation as set forth in Section 5(a) below, or (ii) in case Knowledge shall come to an Insured hereunder of any claim of title or interest that is adverse to the Title, as insured, and that might cause loss or damage for which the Company may be liable by virtue of this policy. If the Company is prejudiced by the failure of the Insured Claimant to provide prompt notice, the Company's liability to the Insured Claimant under the policy shall be reduced to the extent of the prejudice.
   When, after the Date of the Policy, the Insured notifies the Company as required herein of a lien, encumbrance, adverse claim or other defect in Title insured by this policy that is not excluded or excepted from the coverage of this policy, the Company shall promptly investigate the charge to determine whether the lien, encumbrance, adverse claim or defect or other matter is valid and not barred by law or statute. The Company shall notify the Insured in writing, within a reasonable time, of its determination as to the validity or invalidity of the Insured's claim or charge under the policy. If the Company concludes that the lien, encumbrance, adverse claim or defect is not covered by this policy, or was otherwise addressed in the closing of the transaction in connection with which this policy was issued, the Company shall specifically advise the Insured of the reasons for its determination. If the Company concludes that the lien, encumbrance, adverse claim or defect is valid, the Company shall take one of the following actions: (i) institute the necessary proceedings to clear the lien, encumbrance, adverse claim or defect from the Title as insured; (ii) indemnify the Insured as provided in this policy; (iii) upon payment of appropriate premium and charges therefore, issue to the Insured Claimant or to a subsequent owner, mortgagee or holder of the estate or interest in the Land insured by this policy, a policy of title insurance without exception for the lien, encumbrance, adverse claim or defect, said policy to be in an amount equal to the current value of the Land or, if a loan policy, the amount of the loan; (iv) indemnify another title insurance company in connection with its issuance of a policy(ies) of title insurance without exception for the lien, encumbrance, adverse claim or defect; (v) secure a release or other document discharging the lien, encumbrance, adverse claim or defect; or (vi) undertake a combination of (i) through (v) herein.

4. **PROOF OF LOSS.**
   In the event the Company is unable to determine the amount of loss or damage, the Company may, at its option, require as a condition of payment that the Insured Claimant furnish a signed proof of loss. The proof of loss must describe the defect, lien, encumbrance or other matter insured against by this policy that constitutes the basis of loss or damage and shall state, to the extent possible, the basis of calculating the amount of the loss or damage.

5. **DEFENSE AND PROSECUTION OF ACTIONS.**
   (a) Upon written request by the Insured, and subject to the options contained in Sections 3 and 7 of these Conditions, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an Insured in litigation in which any third party asserts a claim covered by this policy adverse to the Insured. This obligation is limited to only those stated causes of action alleging matters insured against by this policy. The Company shall have the right to select counsel of its choice (subject to the right of the Insured to object for reasonable cause) to represent the Insured as to those stated causes of action. It shall not be liable for and will not pay the fees of any other counsel. The

## CONDITIONS Continued

Company will not pay any fees, costs or expenses incurred by the Insured in the defense of those causes of action that allege matters not insured against by this policy.

(b) The Company shall have the right, in addition to the options contained in Sections 3 and 7, at its own cost, to institute and prosecute any action or proceeding or to do any other act that in its opinion may be necessary or desirable to establish the Title, as insured, or to prevent or reduce loss or damage to the Insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable to the Insured. The exercise of these rights shall not be an admission of liability or waiver of any provision of this policy. If the Company exercises its rights under this subsection, it must do so diligently.

(c) Whenever the Company brings an action or asserts a defense as required or permitted by this policy, the Company may pursue the litigation to a final determination by a court of competent jurisdiction and it expressly reserves the right, in its sole discretion, to appeal from any adverse judgment or order.

6. **DUTY OF INSURED CLAIMANT TO COOPERATE.**

(a) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding and any appeals, the Insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, including the right to use, at its option, the name of the Insured for this purpose. Whenever requested by the Company, the Insured, at the Company's expense, shall give the Company all reasonable aid (i) in securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act that in the opinion of the Company may be necessary or desirable to establish the Title or any other matter as insured. If the Company is prejudiced by the failure of the Insured to furnish the required cooperation, the Company's obligations to the Insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters requiring such cooperation.

(b) The Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, all records, in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, that reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage. All information designated as confidential by the Insured Claimant provided to the Company pursuant to this Section shall not be disclosed to others unless, in the reasonable judgment of the Company, it is necessary in the administration of the claim. Failure of the Insured Claimant to submit for examination under oath, produce any reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this subsection, unless prohibited by law or governmental regulation, shall terminate any liability of the Company under this policy as to that claim.

7. **OPTIONS TO PAY OR OTHERWISE SETTLE CLAIMS; TERMINATION OF LIABILITY.**
In case of a claim under this policy, the Company shall have the following additional options:

(a) To Pay or Tender Payment of the Amount of Insurance.
To pay or tender payment of the Amount of Insurance under this policy together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment or tender of payment and that the Company is obligated to pay. Upon the exercise by the Company of this option, all liability and obligations of the Company to the Insured under this policy, other than to make the payment required in this subsection, shall terminate, including any liability or obligation to defend, prosecute, or continue any litigation.

(b) To Pay or Otherwise Settle With Parties Other than the Insured or With the Insured Claimant.

(i) to pay or otherwise settle with other parties for or in the name of an Insured Claimant any claim insured against under this policy. In addition, the Company will pay any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay; or

(ii) to pay or otherwise settle with the Insured Claimant the loss or damage provided for under this policy, together with any costs, attorneys' fees and expenses incurred by the Insured Claimant that were authorized by the Company up to the time of payment and that the Company is obligated to pay. Upon the exercise by the Company of either of the options provided for in subsections (b)(i) or (ii), the Company's obligations to the Insured under this policy for the claimed loss or damage, other than the payments required to be made, shall terminate, including any liability or obligation to defend, prosecute or continue any litigation.

8. **DETERMINATION AND EXTENT OF LIABILITY.**
This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the Insured Claimant who has suffered loss or damage by reason of matters insured against by this policy.

(a) The extent of liability of the Company for loss or damage under this policy shall not exceed the lesser of:

(i) the Amount of Insurance; or

(ii) the difference between the value of the Title as insured and the value of the Title subject to the risk insured against by this policy.

(b) If the Company pursues its rights under Section 3 or 5 and is unsuccessful in establishing the Title, as insured,

(i) the Amount of Insurance shall be increased by 10%, and

(ii) the Insured Claimant shall have the right to have the loss or damage determined either as of the date the claim was made by the Insured Claimant or as of the date it is settled and paid.

(c) In addition to the extent of liability under (a) and (b), the Company will also pay those costs, attorneys' fees and expenses incurred in accordance with Sections 5 and 7 of these Conditions.

9. **LIMITATION OF LIABILITY.**

(a) If the Company establishes the Title, or removes the alleged defect, lien or encumbrance, or cures the lack of a right of access to or from the Land, all as insured, or takes action in accordance with Section 3 or 7, in a reasonably diligent manner by any method, including litigation and the completion of any appeals, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused to the Insured.

(b) In the event of any litigation, including litigation by the Company or with the Company's consent, the Company shall have no liability for loss or damage until there has been a final determination by a court of competent jurisdiction, and disposition of all appeals, adverse to the Title, as insured.

(c) The Company shall not be liable for loss or damage to the Insured for liability voluntarily assumed by the Insured in settling any claim or suit without the prior written consent of the Company.

## CONDITIONS Continued

**10. REDUCTION OF INSURANCE; REDUCTION OR TERMINATION OF LIABILITY.**

All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the Amount of Insurance by the amount of the payment.

**11. LIABILITY NONCUMULATIVE.**

The Amount of Insurance shall be reduced by any amount the Company pays under any policy insuring a Mortgage to which exception is taken in Schedule B or to which the Insured has agreed, assumed, or taken subject or which is executed by an Insured after Date of Policy and which is a charge or lien on the Title, and the amount so paid shall be deemed a payment to the Insured under this policy.

**12. PAYMENT OF LOSS.**

When liability and the extent of loss or damage have been definitely fixed in accordance with these Conditions, the payment shall be made within 30 days.

**13. RIGHTS OF RECOVERY UPON PAYMENT OR SETTLEMENT.**

(a) Whenever the Company shall have settled and paid a claim under this policy, it shall be subrogated and entitled to the rights of the Insured Claimant in the Title and all other rights and remedies in respect to the claim that the Insured Claimant has against any person or property, to the extent of the amount of any loss, costs, attorneys' fees and expenses paid by the Company. If requested by the Company, the Insured Claimant shall execute documents to evidence the transfer to the Company of these rights and remedies. The Insured Claimant shall permit the Company to sue, compromise or settle in the name of the Insured Claimant and to use the name of the Insured Claimant in any transaction or litigation involving these rights and remedies.

If a payment on account of a claim does not fully cover the loss of the Insured Claimant, the Company shall defer the exercise of its right to recover until after the Insured Claimant shall have recovered its loss.

(b) The Company's right of subrogation includes the rights of the Insured to indemnities, guaranties, other policies of insurance or bonds, notwithstanding any terms or conditions contained in those instruments that address subrogation rights.

**14. ARBITRATION.**

Either the Company or the Insured may demand that the claim or controversy shall be submitted to arbitration pursuant to the Title Insurance Arbitration Rules of the American Land Title Association ("Rules"). Except as provided in the Rules, there shall be no joinder or consolidation with claims or controversies of other persons. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the Insured arising out of or relating to this policy, any service in connection with its issuance or the breach of a policy provision, or to any other controversy or claim arising out of the transaction giving rise to this policy. All arbitrable matters when the Amount of Insurance is $2,000,000 or less shall be arbitrated at the option of either the Company or the Insured, unless the Insured is an individual person (as distinguished from an Entity). All arbitrable matters when the Amount of Insurance is in excess of $2,000,000 shall be arbitrated only when agreed to by both the Company and the Insured. Arbitration pursuant to this policy and under the Rules shall be binding upon the parties. Judgment upon the award rendered by the Arbitrator(s) may be entered in any court of competent jurisdiction.

**15. LIABILITY LIMITED TO THIS POLICY; POLICY ENTIRE CONTRACT.**

(a) This policy together with all endorsements, if any, attached to it by the Company is the entire policy and contract between the Insured and the Company. In interpreting any provision of this policy, this policy shall be construed as a whole.

(b) Any claim of loss or damage that arises out of the status of the Title or by any action asserting such claim, shall be restricted to this policy.

(c) Any amendment of or endorsement to this policy must be in writing and authenticated by an authorized person, or expressly incorporated by Schedule A of this policy.

(d) Each endorsement to this policy issued at any time is made a part of this policy and is subject to all of its terms and provisions. Except as the endorsement expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsement, (iii) extend the Date of Policy or (iv) increase the Amount of Insurance. Each Commitment, endorsement or other form, or provision in the Schedules to this policy that refers to a term defined in Section 1 of the Conditions shall be deemed to refer to the term regardless of whether the term is capitalized in the Commitment, endorsement or other form, or Schedule. Each Commitment, endorsement or other form, or provision in the Schedules that refers to the Conditions and Stipulations shall be deemed to refer to the Conditions of this policy.

**16. SEVERABILITY.**

In the event any provision of this policy, in whole or in part, is held invalid or unenforceable under applicable law, the policy shall be deemed not to include that provision or such part held to be invalid and all other provisions shall remain in full force and effect.

**17. CHOICE OF LAW; FORUM.**

(a) Choice of Law: The Insured acknowledges the Company has underwritten the risks covered by this policy and determined the premium charged therefor in reliance upon the law affecting interests in real property and applicable to the interpretation, rights, remedies or enforcement of policies of title insurance of the jurisdiction where the Land is located. Therefore, the court or an arbitrator shall apply the law of the jurisdiction where the Land is located to determine the validity of claims against the Title that are adverse to the Insured, and in interpreting and enforcing the terms of this policy. In neither case shall the court or arbitrator apply its conflicts of laws principles to determine the applicable law.

(b) Choice of Forum: Any litigation or other proceeding brought by the Insured against the Company must be filed only in a state or federal court within the United States of America or its territories having appropriate jurisdiction.

**18. NOTICES, WHERE SENT.**

Any notice of claim and any other notice or statement in writing required to be given the Company under this Policy must be given to the Company P.O. Box 2029, Houston, Texas 77252-2029.

Form T-1 Owner's Policy of Title Insurance Sch A (Rev. 1/3/14)

# SCHEDULE A

**Name and Address of Title Insurance Company:**

Stewart Title Guaranty Company
P.O. Box 2029, Houston, TX  77252

**File No.:** 01004-16002

**Policy No.:** O-5966-000012505

**Address for Reference only:**  1500 South IH-35, Waco, TX

**Amount of Insurance:** ███████

**Premium:** ████████

**Date of Policy:**  February 02, 2017

1. **Name of Insured:**

   Ampler Real Estate, LLC, a Nebraska limited liability company

2. **The estate or interest in the Land that is insured by this policy is:**

   Fee Simple

3. **Title is insured as vested in:**

   Ampler Real Estate, LLC, a Nebraska limited liability company

4. **The Land referred to in this policy is described as follows:**

   Being Lot Eighteen (18) in Block Eleven (11) of the Prather's Anita Park Addition, to the City of Waco, McLennan County Texas, as per plat recorded in Volume 1718, Page 239, of the McLennan County Deed Records, (Being a resub. f Lots 1-4 11-14, Block 11 of the Prather's Anita Park Addition (179-8) and part of South 15th Street (Abandoned) and a 20' alley (abandoned) to the City of Waco, McLennan County, Texas and being further described by metes and bounds as follows:

   BEING 0.777 acre (33.873 square feet) of land being all of Lot 1, Block 11 and part of Lots 2, 13, and 14 Block 11 of the Prather's Anita Park Addition to the City of Waco, Deed Records of McLennan County, Texas, being also part of south 15th Street and a 20 foot alley abandoned by Ordinance #1984-29, being also part of that certain 1.30 acre tract of land described in a substitute trustee's deed by Allen Pruitt Substitute Trustee, to the Texas National Bank of Waco McLennan County Texas, as recorded August 4, 1989 in Volume 1669, Page 89 of said Deed Records, being described by metes and bounds as follows:

   BEGINNING at an iron stake being the intersection of the center line of said abandoned south 15th street and the Northwesterly line of Speight Avenue;

   THENCE S 42 degrees 38 minutes 50 seconds W with said Northwesterly Line a distance of 33.62 feet to an iron being the southeast corner of said Lot 1;

   THENCE S 42 degrees 28 minutes 31 seconds W with said Northwesterly Line a distance of 90.38 feet to an iron stake for a corner;

   THENCE N 47 degrees 17 minutes 17 seconds W a distance of 251.52 feet to an iron stake for a corner in the east line of Interstate highway No. 35 being also in the West line of said Lot 13;

   THENCE N 11 degrees 18 minutes E with said East and West lines a distance of 45.36 feet to a concrete monument for a corner;

**STEWART TITLE
GUARANTY COMPANY**

Form T-1 Owner's Policy of Title Insurance Sch A (Rev. 1/3/14)

THENCE N 42 degrees 24 minutes 57 seconds E with said East line a distance of 49.99 feet to a concrete monument for a corner;

THENCE N 22 degrees 56 minutes 5 seconds E with said East line a distance of 37.51 feet to an iron stake for a corner being the said center line of South 15th Street;

THENCE South 47 degrees 17 minutes 17 seconds E with said center line a distance of 287.71 feet to the place of beginning containing 0.777 acre (33,873 square feet) of land more or less.

SAVE AND EXCEPT 0.010 of an acre, more or less, as described in Warranty Deed 03/24/2016 executed by DOWNSTREAM PARTNERS to TEXAS STATE OF recorded as Instrument # 2016009001 in the Official Public Records of McLennan County, Texas.

**STEWART TITLE
GUARANTY COMPANY**

Form T-1 Owner's Policy of Title Insurance (Rev. 1/3/14)

## SCHEDULE B

**File No.: 01004-16002**                                                              **Policy No.: O-5966-000012505**

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of the terms and conditions of the leases and easements, if any, shown in Schedule A, and the following matters:

1. ~~The following restrictive covenants of record itemized below (the Company must either insert specific recording data or delete this exception):~~

2. Shortages in area.

3. Homestead or community property or survivorship rights, if any, of any spouse of any Insured.

4. Any titles or rights asserted by anyone, including but not limited to, persons, the public, corporations, governments or other entities,
   a. to tidelands, or lands comprising the shores or beds of navigable or perennial rivers and streams, lakes, bays, gulfs or oceans, or
   b. to lands beyond the line of the harbor or bulkhead lines as established or changed by any government, or
   c. to filled-in lands, or artificial islands, or
   d. to statutory water rights, including riparian rights, or
   e. to the area extending from the line of mean low tide to the line of vegetation, or the right of access to that area or easement along and across that area.

5. Standby fees, taxes and assessments by any taxing authority for the year 2017, and subsequent years; and subsequent taxes and assessments by any taxing authority for prior years due to change in land usage or ownership, but not those taxes or assessments for prior years because of an exemption granted to a previous owner of the property under Section 11.13, Texas Tax Code, or because of improvements not assessed for a previous tax year.

6. The following matters and all terms of the documents creating or offering evidence of the matters (The Company must insert matters or delete this exception.):
   a. A 20' utility easement across the Southeast side of said lot as shown on plat of said addition recorded in Volume 1718, Page 239, McLennan County Deed Records, as shown on survey dated 01/18/2017 by James G. Temple, R.P.L.S. No. 6296.

**STEWART TITLE
GUARANTY COMPANY**

# STEWART TITLE GUARANTY COMPANY

### 1. IMPORTANT NOTICE

To obtain information or make a complaint:

2. You may contact your title insurance agent at (915) 225-8200.

3. You may call Stewart Title Guaranty Company's toll-free number for information or to make a complaint at:

**(800) 729-1902**

4. You may also write to Stewart Title Guaranty Company at P.O. Box 2029, Houston, TX 77252-2029

5. You may contact the Texas Department of Insurance to obtain information on companies, coverage's, rights or complaints at:

**(800) 252-3439**

6. You may write the Texas Department of Insurance:

**P.O. Box 149104**
**Austin, TX 78714-9104**
**Fax: (512) 490-1007**
**Web: www.tdi.texas.gov**
**E-mail: Consumerprotection@tdi.texas.gov**

7. **PREMIUM OR CLAIM DISPUTES:**

Should you have a dispute concerning your premium or about a claim, you should contact the (agent) (company) (agent or the company) first.  If the dispute is not resolved, you may contact the Texas Department of Insurance.

8. **ATTACH THIS NOTICE TO YOUR POLICY:**

This notice is for information only and does not become a part or condition of the attached document.

### 1. AVISO IMPORTANTE

Para obtener informacion o para presentar una queja:

2. Usted puede comunicarse con su agente al: (915) 225-8200.

3. Usted puede llamar al numero de telefono gratuito de Stewart Title Guaranty Company's para obtener informacion o para presentar una queja al:

**1-800-729-1902**

4. Usted tambien puede escribir a Stewart Title Guaranty Company, P.O. Box 2029, Houston, TX 77252-2029

5. Usted puede comunicarse con el Departamento de Seguros de Texas para obtener informacion sobre companias, coberturas, derechos, o quejas al:

**(800) 252-3439**

6. Usted puede escribir al Departamento de Seguros de Texas a:

**P.O. Box 149104**
**Austin, TX 78714-9104**
**Fax: (512) 490-1007**
**Web: www.tdi.texas.gov**
**E-mail: Consumerprotection@tdi.texas.gov**

7. **DISPUTAS POR PRIMAS DE SEGUROS O RECLAMACIONES:**

Si tiene una disputa relacionada con su prima de seguro o con una reclamacion usted debe comunicarse con (el agente) (la compania) (el agente o la compania) primero.  Si la disputa no es resuelta, usted puede comunicarse con el Departamento de Seguros de Texas (TDI).

8. **ADJUNTE ESTE AVISO A SU POLIZA:**

Este aviso es solamente para proposito informativos  y no se convierte en parte o en condicion del documento adjunto.

Form T-19.1 Restrictions, Encroachments, Minerals Endorsement Owner's Policy (Rev. 1/3/14)

# RESTRICTIONS, ENCROACHMENTS, MINERALS ENDORSEMENT
## OWNER'S POLICY (FORM T-19.1)

### ENDORSEMENT ATTACHED TO AND MADE A PART OF POLICY OF TITLE INSURANCE
### SERIAL NUMBER O-5966-000012505

### ISSUED BY
# STEWART TITLE GUARANTY COMPANY
### HEREIN CALLED THE COMPANY

1. The insurance provided by this endorsement is subject to the exclusions in Section 5 of this endorsement; and the Exclusions from Coverage, the Exceptions from Coverage contained in Schedule B, and the Conditions in the policy.

2. For the purposes of this endorsement only:

   a. "Covenant" means a covenant, condition, limitation or restriction in a document or instrument in effect at Date of Policy.

   b. "Improvement" means a building, structure, road, walkway, driveway, or curb, affixed to either the Land or adjoining land and that by law constitutes real property, but excluding any crops, landscaping, lawn, shrubbery, or trees.

   c. "Private Right" means (i) an option to purchase; (ii) a right of first refusal; or (iii) a right of prior approval of a future purchaser or occupant.

3. The Company insures against loss or damage sustained by the Insured by reason of:

   a. A violation on the Land at Date of Policy of an enforceable Covenant, unless an exception in Schedule B of the policy identifies the violation;

   b. Enforced removal of an Improvement located on the Land at Date of Policy as a result of a violation, at Date of Policy, of a building setback line shown on a plat of subdivision recorded or filed in the Public Records, unless an exception in Schedule B of the policy identifies the violation;

   c. A notice of a violation, recorded in the Public Records at Date of Policy, of an enforceable Covenant relating to environmental protection describing any part of the Land and referring to that Covenant, but only to the extent of the violation of the Covenant referred to in that notice, unless an exception in Schedule B of the policy identifies the notice of the violation; or

   d. Enforcement of a Private Right in a Covenant affecting the Title at Date of Policy based on a transfer of Title on or before Date of Policy that causes a loss of the Insured's Title.

4. The Company insures against loss or damage sustained by reason of:

   a. An encroachment of:

      i. an Improvement located on the Land, at Date of Policy, onto adjoining land or onto that portion of the Land subject to an easement; or

      ii. an Improvement located on adjoining land onto the Land at Date of Policy

      unless an exception in Schedule B of the policy identifies the encroachment otherwise insured against in Sections 4.a.i or 4.a.ii; or

   b. A final court order or judgment requiring the removal from any land adjoining the Land of an encroachment identified in Schedule B; or

   c. Damage to an Improvement located on the Land, at Date of Policy that is located on or encroaches onto that portion of the Land subject to an easement excepted in Schedule B, which damage results from the exercise of the right to maintain the easement for the purpose for which it was granted or reserved; or

   d. Damage to an Improvement located on the Land on or after Date of Policy, resulting from the future exercise of a right to use the surface of the Land for the extraction or development of minerals or any other subsurface substances excepted from the description of the Land or excepted in Schedule B.

File No. 01004-16002
Form T-19.1 Restrictions, Encroachments, Minerals Endorsement Owner's Policy (Rev. 1/3/14)

Form T-19.1 Restrictions, Encroachments, Minerals Endorsement Owner's Policy (Rev. 1/3/14)

5.   This endorsement does not insure against loss or damage (and the Company will not pay costs, attorneys' fees, or expenses) resulting from:

   a.   any Covenant contained in an instrument creating a lease;

   b.   any Covenant relating to obligations of any type to perform maintenance, repair, or remediation on the Land;

   c.   except as provided in Paragraph 3.c, any Covenant relating to environmental protection of any kind or nature, including hazardous or toxic matters, conditions, or substances;

   d.   contamination, explosion, fire, fracturing, vibration, earthquake or subsidence; or

   e.   negligence by a person or an Entity exercising a right to extract or develop minerals or other subsurface substances.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Countersigned by:

Authorized Countersignature

Stewart Title Company
415 North Mesa Street
El Paso, TX 79901
Agent ID: 43600A

**stewart**
title guaranty company

Matt Morris
President and CEO

Denise Carraux
Secretary

Endorsement
Serial No.          E-5979-319636733

ACCESS ENDORSEMENT (T-23) 4/1/04

ENDORSEMENT ATTACHED TO AND
MADE A PART OF POLICY OF TITLE
INSURANCE SERIAL NUMBER
**O-5966-000012505** ISSUED BY

## STEWART TITLE GUARANTY COMPANY

HEREIN CALLED THE COMPANY

The Company insures against loss or damage sustained by the insured if, at Date of Policy: (i) the land does not abut and have both actual vehicular and pedestrian access to and from Speight Avenue (the "Street"), or (ii) the Street is not physically open.

This endorsement is made a part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Countersigned by:

Authorized Countersignature

Stewart Title Company
415 North Mesa Street
El Paso, TX 79901
Agent ID: 43600A

**stewart**
title guaranty company

**Matt Morris**
**President and CEO**

**Denise Carraux**
**Secretary**

Endorsement
Serial No.          **E-5922-446026982**